UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| ANNIE R. IRVING, | ) |
| | ) |
| Plaintiff, | ) No. 4:21-CV-506 RLW |
| | ) |
| v. | ) |
| | ) |
| DIERBERGS MARKET, INC., | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM AND ORDER**

This matter is before the Court on Defendant Dierbergs Markets, Inc.'s ("Dierbergs") Motion for Summary Judgment. (ECF No. 44). This matter is fully briefed and ready for disposition. For the reasons stated herein, the Court grants Dierbergs' Motion for Summary Judgment.

**BACKGROUND[1]**

Plaintiff Annie Irving ("Irving") began working for Dierbergs as a cashier on April 7, 2015, when she was 55 years old. (Defendant Dierberg[s] Markets, Inc's Statement of Uncontroverted Material Facts in Support of its Motion for Summary Judgment ("DSUMF"), ECF No. 45, ¶¶ 1-2).

At the Dierbergs store where Irving worked, there were three types of check out lanes: (1) self-service or U-Scan lane; (2) express lane for customers with 20 items or less where the cashier scanned and bagged the purchases; and (3) normal lane where the cashier would scan

---

[1] Dierbergs' Statement of Uncontroverted Material Facts (ECF No. 45) is deemed admitted for purposes of summary judgment because Irving did not specifically controvert them in a response to the statement of material facts. *See* E.D. Mo. L.R. 4.01(E); *Holloway v. Union Pac. R.R. Co.*, 762 F. App'x 350, 352 (8th Cir. 2019); *Roe v. St. Louis Univ.*, 746 F.3d 874, 881 (8th Cir. 2014).

items, but a courtesy clerk typically bagged the items. (DSUMF, ¶ 3). Irving worked on the express lane for three years before her physical impairments became an issue. (DSUMF, ¶ 4).

In 2017 and 2018, Irving obtained two non-FMLA leaves from Dierbergs, without any complaints. (DSUMF, ¶¶ 5-8).

Irving testified that her physical impairments began affecting her work performance in 2018. (DSUMF, ¶ 9). Irving asked to be removed from the express lane, due to her worsening medical condition. (DSUMF, ¶ 10). Irving transferred to the floral department. (*Id.*) After working in floral for a while, Irving then split her time between in floral and as a cashier. (DSUMF, ¶ 11). When she worked as a cashier, Irving worked exclusively in a normal check-out lane, with a bagger. (DSUMF, ¶ 12).

In correspondence dated November 20, 2019, Dierbergs' worker's compensation third party administrator informed Irving that its physician's independent medical examination found that Irving's physical impairments were not related to her employment with Dierbergs. As a result, Dierbergs would not provide Irving with any additional medical care for these matters. (DSUMF, ¶ 27).

Nurse Practitioner Shearita Sandoval prepared November 20, 2019 note, stating that Irving needed to be off work until December 11, 2019. (DSUMF, ¶ 28). After receiving the note, Irving was approved for a leave of absence from Dierbergs from November 20, 2019 through December 11, 2019.

Irving testified that she called Dierbergs on December 11, 2019, and asked to speak to head cashier Lisa Robinson, but she was not working. Instead, Irving spoke to Assistant Store Director Dave Pimperl, who told Irving that she was not on the schedule and should call back. When Irving called back the next day, Ms. Robinson told Irving that the floral manager was

supposed to call Irving about scheduling. However, no one from the floral department called Irving. During her conversations on December 11-12, 2019, no one told Irving that her employment had been terminated. Irving never contacted Dierbergs' human resources department about her employment. Instead, Irving filed a claim for unemployment benefits with the Missouri Division of Employment Security on December 15, 2019. (DSUMF, ¶ 34).

On December 17, 2019, Dierbergs' human resources department mailed Irving a "Non-FMLA Notice of Eligibility and Rights and Responsibilities" form, which required Irving to submit (i) medical certification to support the request for leave and (ii) a completed and signed Request for Leave of Absence form by December 26, 2019. (DSUMF, ¶ 35). The form further stated, "[i]f circumstances of your leave changes, and you are able to return to work earlier than the date indicated on this form, you will be required to notify Beth or Amy in Payroll and your direct supervisor at least two workdays prior to the date you intend to report for work." (DSUMF, ¶ 36).

Irving did not notify Beth or Amy in payroll to inform them that Irving could return to light duty work. She also did not notify her direct supervisor that she wanted to return to work. (DSUMF, ¶¶ 37-38).

On January 9, 2020, Amy Hackmeister from Dierbergs' payroll department, sent Irving a "Second Request" letter, informing Irving that Dierbergs had not received a response to its Non-FMLA Notice of Eligibility and Right and Responsibilities. The "Second Request" further stated:

> It is critical that you comply by submitting the enclosed Request for Leave of Absence with the requested documentation supporting your need for leave for consideration for approval no later than 5 p.m. on Friday January 17, 2020. If these forms are not returned and completed to the Company's satisfaction, your leave may be delayed or denied, and any unauthorized absences may count against you. Failure to return and complete these forms may results in corrective

action, up to and including termination of your employment with Dierbergs, for failing to comply with Dierbergs Leave of Absence Policy and for being on an unauthorized Leave of Absence.

**WE MUST RECEIVE THE REQUESTED DOCUMENTS BY 5 P.M. ON FRIDAY, JANUARY 17, 2020.**

(DSUMF, ¶ 40).

On January 21, 2020, Mike Willis from Dierbergs' Payroll Department, sent Irving a "Third Request" letter, noting that Dierbergs had not received a response to its Non-FMLA Notice of Eligibility and Rights and Responsibilities and that this notice was the third and final request for her paperwork. (DSUMF, ¶ 41). The "Third Notice" stated:

**Despite two prior requests you have failed to comply with Dierbergs policies. Accordingly, you are terminated effective Wednesday January 29, 20202 for failing to comply with Dierbergs Leave of Absence Policy and for being on an unauthorized Leave of Absence, UNLESS we receive the completed documents by 5 P.M. on WEDNESDAY, JANUARY 29, 2020.**

**This is the FINAL request for your paperwork**.

Irving did not respond to the "Third Request" letter.  Consequently, Irving was terminated when she was 61 years old.  (DSUMF, ¶ 42).

On January 31, 2020, Irving sent an email to Angela Beck, with Dierbergs' workers' compensation third-party administrator, advising Beck to "forward all correspondence to my attorney Celestine Dotson . . . I believe you have discriminated against me pertaining to this situation." (DSUMF, ¶ 43).

On January 31, 2020, Irving filed her Claim for Compensation forms with the Missouri Division of Workers' Compensation on January 31, 2020, which were assigned Injury No. 19-040180 (both hands—bilateral carpel tunnel) and Injury No. 18-112389 (rotator cuff tear—left shoulder).  (DSUMF, ¶ 44).

On April 9, 2020, Irving filed a Charge of Discrimination, assigned Charge No. 560-2020-00758 (hereinafter "'758 Charge") with the Equal Employment Opportunity Commission ("EEOC"). (DSUMF, ¶ 48). Irving checked the boxes for race and age. (*Id*.) On August 17, 2020, the EEOC issued a Dismissal and Notice of Rights letter related to Irving's '758 Charge. (DSUMF, ¶ 49) The Dismissal and Notice of Rights stated any "lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice; or your right to sue based on this charge will be lost." (*Id*.)

On September 18, 2020, Irving filed another Charge of Discrimination, assigned No. 560-2020-02576 ("'2576 Charge"), wherein she checked the boxes for retaliation and disability. (DSUMF, ¶ 50). On May 20, 2021, the EEOC issued a Dismissal and Notice of Rights letter related to Irving's '2576 Charge. (DSUMF, ¶ 53).

Irving filed her original Complaint with the Court on April 30, 2021. (DSUMF, ¶ 51).

## STANDARD OF REVIEW

The Court may grant a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Citrate*, 477 U.S. 317, 322 (1986); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011). The substantive law determines which facts are critical and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Only disputes over facts that might affect the outcome will properly preclude summary judgment. *Id.* Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.*

A moving party always bears the burden of informing the Court of the basis of its motion. *Celotex Corp.*, 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 248. The nonmoving party may not rest upon mere allegations or denials of his pleading. *Id.*

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in his favor. *Celotex Corp.*, 477 U.S. at 331. The Court's function is not to weigh the evidence but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249.

## DISCUSSION

### A. Count I Age Discrimination in Employment Act ("ADEA")

In her Second Amended Complaint (ECF No. 23, "Sec. Compl."), Irving alleges that she is a female over 40. (Sec. Compl., ¶ 23). Irving contends that "[a]s a result of Defendants' policies and practices, Miss Irving was unjustly and discriminatorily deprived of equal employment opportunities because of her age in that:

a. younger employees were regularly given job duties that were preferable in status
b. younger employees were regularly allowed to move to positions which Miss Irving had requested to be assigned but was passed over."

(Sec. Compl., ¶ 25).

In response, Dierbergs argues that Irving's ADEA claim is untimely because she did not file her lawsuit within 90 days of receiving the final agency decision. "The failure to file suit

within 90 days of receiving a notice of final agency action renders a plaintiff's ADEA action untimely." *Hallgren v. U.S. Dep't of Energy*, 331 F.3d 588, 589 (8th Cir. 2003) (citing 29 C.F.R. § 1614.407(a); *Patrick v. Henderson,* 255 F.3d 914, 915 (8th Cir. 2001)).

Here, Irving received her right to sue letter from the EEOC on her race and age-related claims on August 17, 2020. Irving, however, did not file this lawsuit until over eight months later on April 30, 2021. The Court holds that the complaint was filed beyond the limitation and grants summary judgment on Irving's ADEA claim. *See Hallgren*, 331 F.3d at 590.

### B. Count II Disability Discrimination under the Americans with Disabilities act of 1990 ("ADA")

To establish a prima facie case of disability discrimination, a plaintiff "must show that [she] (1) has a 'disability' within the meaning of the ADA, (2) is a 'qualified individual' under the ADA, and (3) 'suffered an adverse employment action as a result of the disability.'" *Fenney v. Dakota, Minn. & E.R.R. Co.*, 327 F.3d 707, 711 (8th Cir. 2003) (quoting *Duty v. Norton–Alcoa Proppants*, 293 F.3d 481, 490 (8th Cir. 2002)); *Denson v. Steak 'n Shake, Inc.*, 910 F.3d 368, 370–71 (8th Cir. 2018). "To be a 'qualified individual' within the meaning of the ADA, an employee must '(1) possess the requisite skill, education, experience, and training for [her] position, and (2) be able to perform the essential job functions, with or without reasonable accommodation.'" *Id*. at 712 (quoting *Heaser v. Toro Co.*, 247 F.3d 826, 830 (8th Cir. 2001)).

Irving alleges she is a "qualified individual with a disability," as defined in 42 U.S.C. § 12101, because her "combined injuries to her arms and shoulders render her disabled in the normal function of life activities and such in the specific functions of the duties assigned to her as an employee of the defendant in that Miss Irving suffers from impairments to her upper extremities that place her in a disabling condition, specifically, she has been diagnosed with a

rotator cuff tear and bilateral carpal tunnel." (Sec. Compl., ¶ 28). Irving further alleges that she was discriminated against based upon Defendant's perception that Irving was disabled. (Sec. Compl., ¶ 30). Irving claims that Defendant perceived her "condition" as being "too disabling for her to continue to work for Dierbergs" and she was "terminated from her employment." (*Id*.) Irving states she was denied and excluded from the position or for the benefit a non-disabled individual with lesser qualifications . . . because [she] is otherwise qualified to perform the essential functions of the position as manager." .

"The threshold question in any disability discrimination case is whether a plaintiff is 'disabled' within the meaning of the ADA." *Barnes v. Nw. Iowa Health Ctr.,* 238 F. Supp. 2d 1053, 1067 (N.D. Iowa 2002) (citing *Brunko v. Mercy Hosp.,* 260 F.3d 939, 942 (8th Cir.2001) ("Because Brunko has not met the first element of actual or perceived disability of a prima facie case under the ADA, she is not entitled to protection under the ADA."); *Krauel v. Iowa Methodist Med. Ctr.,* 95 F.3d 674, 677 (8th Cir. 1996) (stating that threshold requirement of ADA claim is establishing "disability"); *cf. Kellogg v. Union Pac. R.R. Co.,* 233 F.3d 1083, 1086 (8th Cir.2000) (stating that summary judgment is proper in ADA claim where plaintiff fails to establish any element of *prima facie* case)).

42 U.S.C. § 12102(2) defines a "disability" as (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment. To prove actual disability, Irving must show that she is substantially limited in a major life activity. "Major life activities include caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working, as well as sitting, standing, lifting, and reaching." *Cooper v.*

*Olin Corp., Winchester Div.,* 246 F.3d 1083, 1088 (8th Cir.2001) (internal citation omitted.); *Brunko v. Mercy Hosp.*, 260 F.3d 939, 941 (8th Cir. 2001).

The undisputed facts demonstrate Irving is not disabled as the ADA defines this term. Here, Irving alleged that she was limited in the major life activity of "lifting objects of a certain size and weight, lifting over her head, reaching over head, among other activities." (Sec. Compl., ¶ 17). Likewise, in her opposition, Irving claims that "repetitive strain is a disability." (ECF No. 59 at 5). Although lifting itself is identified as a major life activity, the Eighth Circuit "has held that a general lifting restriction without more is insufficient to constitute a disability within the meaning of the ADA." *Brunko,* 260 F.3d at 941–42 (citing *Gutridge v. Clure,* 153 F.3d 898, 901(8th Cir.1998) (45–pound restriction does not limit life activity of lifting); *Snow v. Ridgeview Med. Ctr.,* 128 F.3d 1201, 1207 (8th Cir.1997) (25–pound restriction does not limit ability to perform major life activity)). Irving did not provide any evidence in opposition to Dierbergs Motion for Summary Judgment that a medical provider had found her to have a disability or to be restricted in a major life activity, particularly no medical provider has stated Irving has a permanent lifting restriction. (ECF No. 74 at 6). Therefore, the Court finds that Irving has not demonstrated she was disabled under the ADA. Additionally, even if she suffered from a disability, it is clear that Irving was precluded from performing only a narrow range of jobs, as evidenced by the fact that she states that she "could have returned to the floral department." (ECF No. 63, ¶ 44; SUMF, ¶ 26). Further, Irving has admitted that she can perform activities admitted that she can operate a motor vehicle, dress herself, shower, brush her teeth, go grocery shopping, etc., which indicate she is not disabled. (ECF No. 44 at 14). Indeed, Irving testified that she could perform the duties of a cashier, but not the more physically demanding work on the express or U-scan lanes. (ECF No. 44 at 15; DSUMF, ¶¶ 23-25). Therefore, the Court holds

that Irving has not demonstrated that she was disabled under the ADA because she has not provided the proper medical support and has not demonstrated that she was unable to work.[2]

Secondarily, it appears that Irving also attempts to allege a claim that she was discriminated against because she was perceived as disabled. *See* Sec. Compl., ¶ 30 ("Because of Defendant's perception that Miss Irving's condition was too disabling for her to continue to work for Dierbergs she was not allowed to avail herself of workers compensation benefits and she was terminated from her employment."). A person can be discriminated against because she is "regarded as" disabled in two ways: (1) the employer mistakenly believes that the employee has an impairment (which would substantially limit one or more major life activity), or (2) the employer mistakenly believes that an *actual* impairment substantially limits one or more major life activity. *Brunko v. Mercy Hosp.,* 260 F.3d 939, 942 (8th Cir.2001); *Wenzel v. Missouri-Am. Water Co.*, 404 F.3d 1038, 1041 (8th Cir. 2005).

Again, Irving fails to demonstrate that she was discriminated against because she was regarded as having a disability. Dierbergs attempted to find employment for Irving based upon her reported lifting restrictions, which the Court previously determined did not constitute a disability. "It logically follows then that being regarded as having a limiting but not disabling restriction also cannot be a disability within the meaning of the ADA." *Wenzel v. Missouri-Am. Water Co.*, 404 F.3d 1038, 1041 (8th Cir. 2005) (quoting *Conant v. City of Hibbing,* 271 F.3d 782, 785 (8th Cir.2001)). Indeed, the record indicates that Dierbergs repeatedly tried to

---

[2] Alternatively, Irving has also represented that she was unable to work, in which case she would not have been a "qualified individual." *See* DSUMF, ¶ 54 (After the end of her employment with Defendant, Plaintiff applied for Supplemental Security Income, and on that application Plaintiff checked the "yes" box next to a question that asked "[a]re you unable to work because of illness, injuries or conditions," and listed the date that she became unable to work as November 20, 2019.).

accommodate Irving by allowing her less strenuous positions. These attempts to accommodate Irving do not demonstrate a claim under the ADA that Irving was regarded as disabled.

Finally, even if Irving could state a prima facie case of disability discrimination, the Court holds that Dierbergs has demonstrated a legitimate, nondiscriminatory reason for Irving's termination. *See Kratzer v. Rockwell Collins, Inc.*, 398 F.3d 1040, 1044 (8th Cir. 2005) (Under the ADA, once the plaintiff has made a prima facie case of disability discrimination, the employer "must proffer a legitimate, nondiscriminatory reason for the adverse employment action."). Dierbergs afforded Irving with three separate chances to respond to Human Resources. Instead of providing the required information, Irving told Dierbergs to contact her attorney. Thus, the Court holds Dierbergs had a legitimate, nondiscriminatory reason to terminate Irving's employment, and her claim fails as a matter of law.

In sum, Irving does not plausibly allege that she is "disabled" under any definition within the ADA. The Court grants Dierbergs' Motion for Summary Judgment on Count II.

### C. Count III: Retaliation under the Missouri Whistleblower Protection Act ("WPA"), § 287.575, R.S. Mo.

The Whistleblower's Protection Act makes it unlawful "for an employer to discharge an individual defined as a protected person in this section because of that person's status as a protected person." *Ward v. G4s Secure Sols. (USA), Inc.*, No. 4:20CV891 JCH, 2020 WL 5291938, at *2 (E.D. Mo. Sept. 4, 2020) (citing Mo. Rev. Stat. § 285.575.4); *see also Mucci v. St. Francois Cnty. Ambulance Dist.*, No. 4:19-CV-01868-NCC, 2019 WL 6170721, at *5 (E.D. Mo. Nov. 20, 2019) ("The WPA prohibits an employer from discharging an employee because that employee: (1) "reported to the proper authorities an unlawful act of his or her employer;" (2) "report[ed] to his or her employer serious misconduct of the employer that violates a clear mandate of public policy as articulated in a constitutional provision, statute, or regulation

promulgated under statute;" or (3) "refused to carry out a directive issued by his or her employer that if completed would be a violation of the law." Mo. Rev. Stat. § 285.575.4."). "Protected person" in turn is defined in relevant part as follows: "[A]n employee of an employer who reports to his or her employer serious misconduct of the employer that violates a clear mandate of public policy as articulated in a constitutional provision, statute, or regulation promulgated under statute." *See* Mo. Rev. Stat. § 285.575.2(4). *See also Scott v. Missouri Valley Physicians*, No. 4:03CV1135 DW, 2005 WL 2994298, at *3 (W.D. Mo. Nov. 7, 2005) (noting a narrow public policy exception to the employee-at-will doctrine exists, allowing an at-will employee to maintain a wrongful discharge claim for, *inter alia*, a discharge based on an employee's act of reporting violations of law or public policy to superiors).

Count III for Retaliation Under the Whistleblower's Protection Act ("WPA"), § 285.575 of Plaintiff's Second Amended Complaint alleges that "during her employment with Defendant Miss Irving was subjected to a pattern of discrimination and misconduct in the workplace based, in whole or in part, on the act of making a worker's compensation claim against the Defendant." Sec. Compl., ¶ 33.[3] Irving further alleges that "Defendant knew or should have known that Ms. Irving made good faith claims of work-related injuries," but "ignored the evidence and continued to penalize Miss Irving, leading to her ultimate dismissal." *Id*. at ¶ 34.

Dierbergs argues that Irving's purported claim in Count III under the WPA is precluded by her claim in Count IV under the Missouri Worker's Compensation Retaliation Statute, §287.780. (ECF No. 44 at 22). That is, the WPA provides the exclusive remedy for Irving's alleged injury: "[t]his section is intended to codify the existing common law exceptions to the at-will employment doctrine and to limit their future expansion by the courts. This section, in addition

---

[3] Defendant erroneously refers to this as Doc 23 at p. 7, ¶ 34. *See* ECF No. 44 at 22.

to chapter 213 and chapter 287, shall provide the exclusive remedy for any and all claims of unlawful employment practices." Mo. Rev. Stat. § 285.575.3.

The Court agrees that "the WPA explicitly replaces the common law cause of action." *Mucci v. St. Francois Cnty. Ambulance Dist.*, No. 4:19-CV-01868-NCC, 2019 WL 6170721, at *5 (E.D. Mo. Nov. 20, 2019) (citing *Yerra v. Mercy Clinic Springfield Cntys.*, 536 S.W.3d 348, 351, n.3 (Mo. Ct. App. 2017); *Meehan v. PNC Fin. Servs. Grp., Inc.*, No. 4:17-CV-2876 PLC, 2018 WL 2117655, at *3 (E.D. Mo. May 8, 2018)). However, Dierbergs has not demonstrated that Irving's claims under the WPA do not preclude a cause of action under the Missouri Worker's Compensation Retaliation Statute. See Mo. Rev. Stat. § 285.575.3 ("This section, **in addition to chapter 213 and chapter 287**, shall provide the exclusive remedy for any and all claims of unlawful employment practices." (emphasis added)). The Court, therefore, will not grant summary judgment on this basis.

Nevertheless, the Court finds that Irving's WPA claim fails because she has failed to demonstrate any link between her alleged whistleblowing activity and her termination. As discussed below with respect to her claim under the Missouri Worker's Compensation Retaliation Statute, Irving cannot provide any evidence of causation between her "good faith claims of work-related injuries" and her termination. For this reason, the Court grants Dierbergs' Motion for Summary Judgment as to Count III.

    **D. Count IV: Violation of the Missouri Worker's Compensation Retaliation Statute, §287.780**

In Count IV, Irving attempts to allege a claim under the Missouri Worker's Compensation Retaliation Statute:

> No employer or agent shall discharge or discriminate against any employee for exercising any of his or her rights under this chapter when the exercising of such rights is the motivating factor in the discharge or discrimination. Any employee who has been discharged or discriminated against in such manner shall have a civil action for damages against his or her employer. For purposes of this section, "motivating factor" shall mean that the employee's exercise of his or her rights under this chapter actually played a role in the discharge or discrimination and had a determinative influence on the discharge or discrimination.

Mo. Rev. Stat. § 287.780. Irving alleges that she exercised her rights under . . . Chapter 287 to receive worker's compensation treatment and benefits because she was diagnosed with an occupational disease known as bilateral carpel tunnel syndrome and repetitive motion injury to her shoulder." (Sec. Compl., ¶ 41). She further alleges that, "on December 11, 2019, Defendant discriminated against Plaintiff by terminating her employment, after she contacted her employer about availing herself of worker's compensation benefits." (*Id*., ¶ 42). Irving alleges that her exercise of her worker's compensation benefits "played a motiving favor in her discharge." (*Id*., ¶ 43).

The Court, however, does not find that Irving's exercise of her worker's compensation rights was a motivating factor for her termination. Instead, the evidence supports a finding that Dierbergs attempted to accommodate Irving's injury, as she was transferred to floral and less strenuous check-out lanes, which does not indicate a retaliatory intent.

In addition, the temporal proximity between Irving's treatment and her termination does not support a causal connection. Irving began treatment with a nurse practitioner on May 30, 2019, but she was not discharged until January 2020. This gap of nearly eight months between the protected activity and her termination does not support a retaliation finding, particularly

without any other supporting evidence.  *See Coleman v. Winning*, 967 S.W.2d 644, 648 (Mo. Ct. App. 1998) ("Although timing alone cannot conclusively establish that an employee was discharged for exercising his rights under the Workers' Compensation Laws, proximity in time between the exercise of the right and the time of the firing is a factor to be considered."); *see E.E.O.C. v. Prod. Fabricators, Inc.*, 763 F.3d 963, 973 (8th Cir. 2014) ("Although there is no definitive line drawn to show at what point a temporal connection establishes causation, we have held that two months is too long to support a finding of causation without something more[.]" (citations omitted)); *see also* DSUMF, ¶ 47 (Throughout the entire duration of Plaintiff's employment with Defendant, no one made any derogatory disability related remarks to her). Thus, the Court grants Dierbergs' Motion for Summary Judgment as to Count IV.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Dierbergs Markets, Inc.'s Motion for Summary Judgment. (ECF No. 44)  is **GRANTED**.

An appropriate Judgment is filed herewith.

Dated this 16th day of March, 2023.

*Ronnie L. White*
_____
**RONNIE L. WHITE**
**UNITED STATES DISTRICT JUDGE**